## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD. and ALAMEDA RESEARCH LTD., | |
| Plaintiff, | |
| -against- | Adv. Pro. No. 24-_____(JTD) |
| NAWAAZ MOHAMMAD MEERUN | |
| Defendant. | |

## COMPLAINT FOR FRAUD, BREACH OF CONTRACT, UNJUST ENRICHMENT, AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 105, 547, AND 550, AND DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)

Plaintiffs FTX Trading Ltd. ("FTX") and Alameda Research Ltd. ("Alameda," and together with FTX, "Plaintiffs"), through their undersigned counsel, for their Complaint against Nawaaz Mohammad Meerun ("Meerun" or "Defendant"), allege the following based upon personal knowledge and upon their investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd. is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## NATURE OF THE CASE

1.      Between January 2021 to September 2022, Nawaaz Mohammad Meerun orchestrated a series of massive market manipulation schemes and defrauded hundreds of millions of dollars from FTX.  Meerun executed his fraudulent schemes through dozens of FTX accounts, including accounts opened in the names of aliases using forged or purchased identification documents.  Meerun also repeatedly violated FTX's rules, forcing Alameda to take over Meerun's risky positions and suffer hundreds of millions of dollars in additional losses.  All told, FTX and Alameda suffered approximately $1 billion in losses due to Meerun's crimes, and Meerun has used the proceeds of his exploits to fund a wide range of other criminal activity.

2.      Plaintiffs bring this action, on behalf of themselves and their affiliated debtors and debtors-in-possession (collectively, the "Debtors," and each a "Debtor"), for fraud, breach of contract, unjust enrichment, and preferential transfers pursuant to Sections 105, 502, 547, and 550 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), to avoid as preferential transfers all transfers of property of Plaintiffs to Meerun during the ninety-day period (the "Preference Period") prior to commencement of the above-captioned actions (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), and to disallow any claims related thereto.  Pursuant to Section 502(b)(1) of the Bankruptcy Code, Plaintiffs also object to certain claims filed or held by Meerun in these Chapter 11 Cases that are unenforceable against Plaintiffs.

3.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for the Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the

Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022

[D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and

thereafter to prosecute, this adversary proceeding.

4.     In January 2021, Meerun began laying the groundwork for to perpetrate a fraud

on FTX by accumulating a massive position in an illiquid token ("BTMX").  He eventually

cornered more than half of the total BTMX supply, driving BTMX's price up by 10,000% over

three months.  Meerun knew that the notional value of his BTMX holdings had been massively

(and artificially) inflated by his manipulative trading, and used that inflated value to exploit a

flaw in FTX's margin trading rules, "borrowing" tens of millions of dollars from FTX using his

BTMX holdings as "collateral."  Meerun knew that as soon as his manipulation stopped,

BTMX's price would crash and he would be required to return all of his "borrowed" assets.  But

Meerun had no intention of complying with FTX's rules.

5.     Samuel Bankman-Fried ("Bankman-Fried") and other members of FTX's pre-

petition management began to catch on to Meerun's scheme in late March 2021, repeatedly

asking Meerun to post additional collateral to his FTX account to avoid liquidation.  But Meerun

instead accelerated his "borrowing," knowing he had only a short time left to maximize his heist.

By the time FTX took more aggressive action and froze Meerun's accounts, it was too late–

BTMX's artificially inflated price was beginning to collapse and Meerun had absconded with

*more than $450 million*.

6.     In an attempt to cover up this massive hole, Bankman-Fried and other senior FTX

personnel settled on a now-familiar course of action:  they attempted to paper over the problem

by shifting the losses to another entity within the FTX Group, causing Alameda to take over all

of Meerun's positions in his FTX accounts.  But this only made matters worse–in addition to

accumulating a massive *long* BTMX position, Meerun also had built a massive *short* position in

another illiquid token, called MobileCoin ("MOB"), which Alameda was forced to assume.

Taking over this MOB short position left Alameda exposed to significant risk, so in an attempt to

quickly cover this short position, Alameda began rapidly purchasing significant amounts of

MOB in the open market as well as through over-the-counter ("OTC") deals.  MOB's price

spiked by 750% during the course of Alameda's weeks-long buying spree, forcing Alameda to

pay significantly inflated prices, and then collapsed shortly after Alameda slowed its buying

spree.  By the time the dust settled on the BTMX/MOB situation in August 2021, Alameda

personnel estimated that Alameda had already lost *$1 billion* as a result of Meerun's actions.

7.      But Meerun was not done with FTX.  Although FTX had locked the exchange

accounts that Meerun had used in connection with the BTMX/MOB exploit and made certain

adjustments to FTX's margin rules in an attempt to prevent future exploits, Meerun returned later

in August 2021 with a new set of aliases and FTX exchange accounts.  Once again, Meerun

accumulated significant holdings in illiquid tokens (this time, tokens called "BAO," "TOMO"

and "SXP"), causing the prices of those tokens to skyrocket.  And once again, Meerun was able

to exploit flaws in FTX's margin system–this time, making off with *nearly $200 million* before

FTX caught on and froze his new accounts.

8.      Meerun came back for a third time in early 2022, again with a fresh set of aliases

and FTX exchange accounts.  Over the next several months, Meerun again accumulated

significant holdings in an illiquid token (this time, a token called "KNC"), again driving up the

price.  But this time, a more junior FTX employee identified the misconduct before Meerun

could finish executing his scheme, allowing FTX to take steps to limit Meerun's withdrawals and

avoid yet another 9-figure exploit.  All in all, the Debtors suffered *more than $1 billion in losses* as a result of Meerun's crimes.

9.      The Debtors' post-petition investigation has uncovered significant additional information about Meerun's criminal activity.  Upon information and belief, Meerun has been linked to money laundering operations and Ponzi schemes dating back more than a decade, and has extensive ties to Polish, Romanian, and Ukrainian organized crime networks, including groups linked to human trafficking, as well as to Islamic extremist networks linked to terrorist financing.  Meerun also has continued to engage in cryptocurrency-related exploits even after FTX's collapse, most recently using the alias "Humpy the Whale" to execute a governance attack on another cryptocurrency lending program in June 2024.[2]  Meerun also continues to control (at least) $100 million in cryptocurrency, much of which is traceable to his fraud against FTX, and flaunts his wealth to promote his own personal cryptocurrency token:  "$GOLD."[3]

10.     Through this Complaint, Plaintiffs seek to hold accountable Meerun and anyone else determined to have been involved in or to have facilitated his actions, and to recover the hundreds of millions of dollars exploited from FTX through fraudulent means, and in violation of the FTX Terms of Service.

11.     Based on currently available information, Meerun also received transfers from FTX exchange accounts during the Preference Period of digital and fiat assets valued at approximately $29,443,627 at the time of transfer.  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.

---

[2]     *See*, *e.g*., Vishal Chawla, Compound Reaches Truce with Crypto Whale Humpy After Controversial Vote to Move $24 Million in Tokens, The Block (July 30, 2024); https://www.theblock.co/post/308215/compound-reaches-truce-with-crypto-whale-humpy-after-controversial-vote-to-move-24-million-in-tokens.

[3]     *See Golden Boys* (last visited Nov. 7, 2024), https://Humpysgold.eth.limo.

12.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow all claims filed or held by Meerun or his aliases or collaborators in these Chapter 11 Cases unless and until Meerun and any such individuals have relinquished to Plaintiffs all property received in transfers determined by the Court to be avoidable and/or recoverable. Plaintiffs also object to the two claims filed by Meerun against the Debtors based on purported customer entitlements associated with certain FTX accounts registered to his aliases, collectively totaling $13,213,625.

13.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Meerun that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiffs intend to avoid and/or recover all such transfers and obligations made to or for the benefit of Meerun or any other transferee, and reserve the right to amend this Complaint.  In particular, and without intending to create any limitation, Plaintiffs reserve the right to amend this Complaint to include: (i) further information regarding relevant transfers or obligations, (ii) information regarding additional transfers made or obligations incurred, (iii) additional plaintiffs or defendants, (iv) revisions to the Defendant's name(s), and (v) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

14.     Plaintiff FTX is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX and its subsidiaries and affiliated entities collectively did business as FTX.com and operated a digital asset trading exchange.

15.     Alameda is a British Virgin Islands company limited by shares.

16.     Nawaaz Mohammad Meerun is a Mauritian citizen and, upon information and belief, a resident of Beau Bassin, Mauritius.

17.     Out of an abundance of caution, the Debtors are not at this time identifying the other names associated with the FTX accounts that the Debtors' investigation has linked to Meerun.  On information and belief, several of the accounts connected to Meerun were registered using the names of individuals that were victims of data breaches, and some or all of the other names associated with Meerun's other accounts may be the names of innocent victims.  The Debtors reserve the right to add any of these individuals as Defendants (or anyone else) if the Debtors determine that any such individuals were involved in the conduct at issue in this action.

## JURISDICTION AND VENUE

18.     This adversary proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.

19.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(a), and 1367(a), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

20.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter final orders herein.

21.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

22.     The statutory predicates for the relief requested herein are Sections 105(a), 502, 547, and 550 of the Bankruptcy Code.

23.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates, and to subordinate certain allowed claims.  Fed. R. Bankr. P. 7001(1), (8).

24.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.     Background

25.     Prior to the Petition Date, the FTX Group[4] operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

26.     Alameda served as a market maker for the FTX exchange.  One of the key functions Alameda served within the FTX Group was providing liquidity for newly-issued and thinly-traded cryptocurrencies, including crypto assets with little or no value.  Trial Tr. at 872, *United States* v. *Bankman-Fried*, (S.D.N.Y. Dec. 12, 2022) (describing Alameda's role "market making for shitty things"); *id*. at 1400:19-22.  In addition to market making, Alameda served as a

---

[4]     The term "FTX Group," means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

"backstop liquidity provider" for FTX's margin trading program.  When the value of a customer's collateral fell below the maintenance margin, FTX would begin liquidating the customer's position.  *Id*. at 405:15-18.  If the account continued to lose money, a set of market-makers known as backstop liquidity providers would step in so the losses would not affect other FTX customers.  *Id.*

27.    At all relevant times during Meerun's fraudulent conduct, FTX's terms of service prohibited manipulative trading, which included any "activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct."[5] FTX's terms of service also prohibited "provide[ing] false, inaccurate, incomplete or misleading information," and required that users "provide current, complete, and accurate information for all required elements on the registration page, including your full legal name."[6]  FTX's terms of service also required customers engaged in margin trading or borrowing to maintain sufficient collateral and satisfy all margin requirements.[7]

---

[5]    FTX's Terms of Service applicable beginning in 2020 (the "2020 Terms of Service"); FTX's Terms of Service applicable beginning in 2022 (the "2022 Terms of Service").

[6]    2020 Terms of Service §§ 3, 18; *see also* 2022 Terms of Service §§ 5.1, 13.1.2.

[7]    *See* 2020 Terms of Service § 6 (requiring customers to "maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time.  If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage.  If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed."); 2022 Terms of Service § 2.5.2 ("Complex Product trading requires initial posting of collateral to meet initial margin requirements.  If movements in the markets for a Complex Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met.").

**II.     BTMX/MOB Exploit**

28.     In 2019, BitMax.io ("<u>BitMax</u>"), a Singapore-based crypto exchange, launched its affiliated token, BTMX.  As of January 1, 2021, BTMX  was trading at approximately $0.03.  Just three months later, the price of BTXM peaked around $3.00—an increase of nearly 10,000%.  This was no anomaly:  Between January 1 and March 27, 2021, Meerun deposited 100 million BTMX purchased elsewhere into his FTX accounts, and purchased an additional 263 million BTMX on the FTX exchange.  By March 27, 2021, Meerun held nearly half of all BTMX in existence across his various FTX accounts.

29.     Meerun's BTMX buying spree had quickly attracted attention.  On February 19, 2021, BitMax's Global Head of Business Development, contacted Ryan Salame, then-Head of OTC Trading at Alameda, to discuss a "single large BTMX purchaser on BitMax withdrawing to FTX and potentially engaging in manipulative marketplace practices via BTMX futures products."  The BitMax employee also noted to Salame that Alameda had recently purchased "more than 85mm BTMX" on BitMax, and expressed concern that "the aggressive buyer (whose account has been flagged for additional KYC screens) has continued to purchase BTMX on FTX, thus causing Alameda to purchase BTMX on BitMax in order to provide sufficient liquidity to satisfy this buyer."  The BitMax employee also highlighted BitMax's concerns about "significant concentration of BTMX in the hands of a single account," particularly given the "relatively illiquid nature of BTMX spot markets."  Notwithstanding BitMax's direct outreach (and prescient warnings), FTX appears to have done nothing to protect itself against these actions until it was too late.

30.     By March 1, 2021, Meerun had accumulated more than 300 million BTMX, representing approximately 40% of the total BTMX supply, and Meerun's manipulative trading had driven BTMX's price from $0.03 to approximately $0.75 in just two months, giving

Meerun's BTMX position a paper value of more than $200 million.  During this same period, Meerun also had begun accumulating a high-risk *short* position in another thinly-traded token, MOB, which offered Meerun the potential for tens of millions in profit or theoretically unlimited losses, depending on MOB's price movements.  Meerun then shifted to the second phase of his scheme, and began withdrawing tens of millions of dollars through FTX's margin lending program, using his artificially inflated BTMX holdings as collateral.

31.    Over the next few weeks, Meerun continued buying more BTMX to drive the price even higher, while also continuing to increase his withdrawals from the margin lending program.  At the same time, Meerun also continued to increase his MOB short position.

32.    On March 19, 2021, Meerun received his first email from FTX informing him that his significant withdrawals had left his account at risk of liquidation and asking him to post additional collateral.  Meerun ignored this request and continued buying more BTMX to drive the price up, allowing him to withdraw more funds from FTX.

33.    On March 26, 2021, Bankman-Fried and other senior FTX personnel began to realize the magnitude of the situation and started taking steps to address Meerun's actions.  Bankman-Fried directed Salame to ask the Defendant to "top up" his account, and directed Gary Wang, Chief Technology Officer of FTX, to "look into BTMX and MOB parameters."  FTX sent Meerun another email that same day, requesting again that he post additional collateral.  Meerun did not post additional collateral—instead, he rapidly accelerated the pace of his withdrawals, trying to exploit as much as possible before FTX began to liquidate his accounts.

34.    Bankman-Fried, Salame, Wang, and Nishad Singh, Director of Engineering at FTX, were left scrambling to catch up with Meerun's actions.  On March 27, 2021, Salame asked "do we want to restrict his trading until he replies?," adding that "it almost feels like a competitor

exchange trying to screw us? idk that sounds dumb lol."  Bankman-Fried agreed that they should restrict Meerun's withdrawals, noted that BitMax had previously contacted FTX about Meerun, and asked Salame whether he had heard anything further from BitMax about Meerun's actions. Salame responded that "he's borrowing a metric ton of everything now against BTMX and SUSHI . . . bitmax emailed him and eventually closed his account."  Later that same day, Bankman-Fried directed Wang to put Meerun's account "in reduce-only mode," which would prevent Meerun from continuing to add to his BTMX position.

35.     As of the morning of March 28, 2021, Meerun's manipulated BTMX position had a paper value of nearly $1 billion, and Meerun had withdrawn a total of $450 million from FTX, which included more than $150 million withdrawn on March 27 alone.  That same day, Bankman-Fried pointed out that he had "realized we forgot to block withdrawals �winking" on Meerun's account.  Salame responded:  "ooof i didnt realize how insane the account had gotten."

36.     Concerned that Meerun would attempt to circumvent the limits they had placed on his account, Bankman-Fried directed Wang and Singh to "treat the account as flagged so we'll catch if it tries to feed another account."  Singh replied that Meerun had "already done some stuff with a new account kingofthepudding@protonmail.com . . . which now has blocked withdrawals."  Bankman-Fried reported that he had "messaged him threatening to freeze/liquidate."  Salame bizarrely responded that it "would be cool to keep him as a friend though since he's like 50% of our margin platform lol."

37.     FTX contacted Meerun twice on March 28, 2021.  FTX first requested that Meerun "reduce [his] risk and/or deposit more funds," and informed Meerun that he had "recently likely broken the terms and conditions of FTX" and threatened to "freeze or fully liquidate [Meerun's] account permanently" if he did not cooperate.   Meerun ignored that email

as well, and several hours later, FTX emailed Meerun again, stating that they would freeze or liquidate his accounts "at any moment" if he did not cooperate.  Meerun again did not reply.

38.     FTX ultimately froze Meerun's accounts on March 28, 2021.  But because of the massive size of Meerun's positions (and the massive hole in FTX's balance sheet), Meerun's account could not be easily liquidated.  FTX had long touted its plan for protecting against such situations:  several large market participants served as "backstop liquidity providers" for FTX, which meant that they would agree to step in and take over a customer's open exchange exposures—long or short—in situations where an orderly liquidation could not otherwise be achieved.  In return, the backstop liquidity provider would get to keep the liquidated user's remaining maintenance margin.

39.     But Meerun's exposures were far too risky and his deficit was far too large for any of the backstop liquidity providers unaffiliated with FTX to take on, so Bankman-Fried determined that Alameda would take over Meerun's exposures (and debts) through what was labeled a "manual liquidation."  After taking over the positions in Meerun's FTX accounts, Alameda was left with his massive (and illiquid) BTMX holdings, which quickly began to decline in value, and Alameda was also left with the corresponding $450 million hole.  Alameda also assumed Meerun's MOB short position, which had grown to approximately 23 million MOB—representing approximately 10% of all MOB in existence.  This created significant additional risk for Alameda (and the broader FTX Group)—if the MOB price increased, Alameda would be exposed to potentially massive losses.[8]

---

[8]     Indeed, in a March 28, 2021 internal "customer support" discussion, an FTX employee had shared a customer's question about this exact situation:  "what happens if there's not enoguh [sic] MOB on the books if the MOB shorter gets liquidated/he's insolvent?"  Bankman-Fried responded:  "lol," and added that "BLP [backstop liquidity provider] is the real answer."

40.     Alameda began frantically attempting to cover this short position by accumulating MOB through a variety of methods.  This included purchasing MOB on the FTX exchange as well as striking OTC deals for large quantities of MOB, often at prices far above MOB's then-current trading price.  Alameda's trading sparked a significant increase in MOB prices:  between March 28, 2021, when Alameda took over Meerun's positions, and April 7, 2021, when Alameda had largely covered its short MOB exposure, the price of MOB skyrocketed from approximately $8 to approximately $68, representing a 750% increase.

41.     In total, the losses to Alameda from Meerun's BTMX/MOB exploit were massive.  As of April 8, 2021, Caroline Ellison, Alameda's CEO estimated that Alameda had already incurred $400 million in losses attributable to "MOB guy."  On August 13, 2021, after the dust had largely settled from Meerun's actions, another FTX employee wrote to Bankman-Fried, Ellison, and others that he estimated Alameda had "lost $1b to BTMX/MOB."  But Meerun was not done defrauding FTX.

## III.     BAO/TOMO/SXP Exploit; The Pudding King Strikes Again

42.     In the wake of the BTMX/MOB exploit, FTX adjusted the rules of its margin lending program to impose tighter restrictions on the use of illiquid assets as collateral for each account.  The direct effect of these changes was that no individual FTX customer would be able to execute an exploit at the same scale as Meerun's BTMX/MOB exploit, unless they were coordinating their activities across multiple FTX accounts (in violation of FTX's terms of service).

43.     Because FTX had frozen the accounts that Meerun had used in connection with the BTMX/MOB exploit, Meerun began preparing for his next exploit using a group of more than two dozen other FTX accounts.  Although these FTX accounts were opened using the names of individuals with no obvious connections to Meerun, there were numerous other

indications that these accounts were part of a group of one or more collaborators involving Meerun.

44.     For example, several of these new accounts were accessed using the same devices as had previously been used by Meerun, or transferred funds to (or received funds from) external cryptocurrency wallet addresses that Meerun had used during the BTMX/MOB exploit.  Many of the new accounts were created within minutes of each other, often listing fictional addresses or non-existent area codes.  Many of the accounts also were opened using what appeared to be forged or stolen KYC materials, including several instances in which the same KYC materials were reused for multiple accounts, or where the identification documents were photoshopped to include the same picture for multiple individuals.



KYC materials submitted for "kingofthepudding@protonmail.com"       KYC materials submitted for another food-themed alias

45.     Several of the accounts also were registered to email addresses that shared a distinctive naming convention as a calling card—Meerun had used an email address with "kingofthepudding" in the BTMX/MOB exploit, and many of these new accounts continued with

that theme, using email addresses including "motherofallburgers@protonmail.com,"
"turkiyepizzakebab@int.pl," "donerkebabveryspicy@int.pl" and "sanpedropizza@int.pl."

46.    Armed with his fresh set of FTX accounts, Meerun executed his second exploit of
FTX.  Once again, Meerun identified certain illiquid cryptocurrency tokens (this time, "BAO,"
"TOMO" and "SXP"), and once again, Meerun began engaging in manipulative trading to inflate
the prices of these tokens.  Between August and December 2021, Meerun acquired across his
various FTX accounts significant proportions of all BAO, TOMO and SXP tokens in existence.
As a direct result of Meerun's manipulative trading, the prices for BAO, TOMO and SXP were
each significantly artificially inflated during that same period.  As the notional value of Meerun's
BAO, TOMO and SXP stakes continued to increase, Meerun once again began "borrowing" tens
of millions of dollars through FTX's margin lending program, with no intent to ever repay those
funds when the value of Meerun's accounts inevitably collapsed after he stopped his
manipulative trading.

47.    By December 2021, FTX personnel finally caught on to this second exploit and
froze several of the associated accounts.  But by that time, Meerun had already made off with
more than $200 million in funds that he had "borrowed" with no intent to repay.  Once again,
given the magnitude of the illiquid positions that Meerun had accumulated and the corresponding
debts, Alameda was forced to take over Meerun's positions and absorb the losses.

## IV.    KNC Exploit

48.    By the time that FTX closed down the BAO/TOMO/SXP exploit, Meerun had
already started working on his next exploit of FTX.  Once again, Meerun used a group of FTX
accounts that had been opened using the names of ostensibly unrelated individuals, but that all
had other connections to Meerun.  For example, several of these new accounts transferred funds
to (or received funds from) external cryptocurrency wallet addresses that Meerun had used

during his prior exploits.  Several of the new accounts also were created within minutes of each other, listed fictional addresses or non-existent area codes, and had been opened using what appeared to be forged or stolen KYC materials.

49.     For his third exploit, Meerun took advantage of yet another flaw in FTX's margin lending system:  Because the tighter restrictions that FTX had implemented regarding the use of illiquid assets as collateral did not properly aggregate across subaccounts, Meerun was able to split his holdings across subaccounts and effectively circumvent these limitations.  Meerun again identified an illiquid cryptocurrency token (this time, "KNC"), and beginning in January 2022, again began engaging in manipulative trading to amass a significant KNC position and inflate KNC's price.  Within the primary FTX account that Meerun used for the KNC exploit, he split his KNC holdings across sixty-four subaccounts to evade FTX's collateral limits.

50.     But on May 4, 2022, while Meerun was still manipulating KNC's price and increasing his holdings, a more junior FTX employee recognized that a significant portion of the total KNC supply was being consolidated in an external cryptocurrency wallet address that had been funded by several FTX accounts linked to the BAO, TOMO and SXP exploits.  That FTX employee informed Bankman-Fried, Singh and Wang of his findings and continued investigating, ultimately discovering that "the person doing this is linked all the way back to the MOB short and the [BTMX] incident as well."  Upon learning that the individual responsible for multiple long-running frauds that had caused FTX and Alameda to suffer more than a billion dollars in losses was preparing to execute yet another fraud, Bankman-Fried responded: "wooow," and added "okay maybe also put a freeze on the account, idk – at least a withdrawal freeze."

51.     Singh responded that he had frozen withdrawals for the account in question, and also had implemented another adjustment to FTX's margin lending program designed to further limit the use of KNC and certain other illiquid assets as collateral.  Bankman-Fried responded "oooh nice does that mean we can un-restrict those accounts, in theory?", to which Singh responded "yeah, but is there any reason to?  they're bad boys."  Over the next few days, while Meerun's primary KNC account remained restricted, FTX took several steps to reduce the associated risks, including by forcing Meerun to reduce his KNC position.  On May 9, 2022, Singh reported to Bankman-Fried and others that Meerun had sent FTX a short message claiming that he had been planning to deposit more collateral and adding that "I do acknowledge some responsibility in this situation."  Meerun closed his message by stating:  "Now kindly put my account back to normal mode so I can make some transfers."

52.     More than four months later, on September 18, 2022, the same junior FTX employee informed Bankman-Fried, Singh and others that the "KNC exploiter has been using new accounts since August and is exploiting us again (this is same person as MOB/BTMX and other stuff btw)."  The employee noted that Meerun had effectively cornered 70% of all circulating KNC through his manipulative trading, significantly inflating the price, and that although Meerun's primary KNC account remained subject to certain restrictions, Meerun was still able to "borrow" against the massively overvalued KNC collateral in that account and had already withdrawn $68 million in USD.  The employee added:  "we should prob prevent any more withdrawals happening from these accounts at a minimum?"  After discussing further, FTX ultimately froze and liquidated the accounts, preventing Meerun from causing any further losses to FTX or Alameda.

53.     Based on currently available information, during the Preference Period, Meerun and/or his aliases or collaborators received the benefit of certain withdrawals of digital assets from FTX accounts that Meerun controlled as set forth in Exhibit A.  Based on pricing as of the time of withdrawal, those assets were collectively valued at approximately $29,421,916.  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX's preference claim against Meerun and/or his aliases or collaborators may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into FTX accounts controlled by Meerun and/or his aliases or collaborators subsequent to these preferential transfers.

54.     Apparently not satisfied with the hundreds of millions of dollars he exploited from the Debtors through his fraudulent pre-petition conduct, Meerun also has filed two claims in these Chapter 11 Cases (Claim Nos. 83997 and 81455) totaling approximately $13.2 million. This includes a $13 million customer claim that Meerun filed using his own name, address and KYC information, notwithstanding that the account in question was the primary account used in the KNC exploit and originally had been opened under a different name.  In addition to these two claims that Meerun filed, seven other FTX accounts used by Meerun had scheduled customer claims, with balances as of the Petition Date collectively totaling approximately $350,000. (Customer Code Nos. 312578, 320848, 1773080, 1805716, 1805741, 2629959, and 2767975.) Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs seek to disallow any and all claims filed or held by Meerun and/or his aliases or collaborators in these Chapter 11 Cases unless and until Meerun has relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

V.     **Meerun's Continued Misconduct and Criminal Linkages**

55.     Even after FTX's collapse, Meerun has continued engaging in widespread market manipulation and defrauded other cryptocurrency market participants.

56.     For example, using one of his most recent aliases, "Humpy the Whale," Meerun has touted his past criminal conduct as evidence of his trading savvy.  Meerun maintains a website devoted to promoting Humpy's "brand," which includes a fanfiction origin story— "Legend of the Golden Egg"—describing ways in which Humpy had accumulated his wealth. Of note, the story describes how Humpy had profited from "activat[ing] a powerful ability he had learned during his early days in DeFi City—a flash loan exploit," which is similar to the exploits that Meerun had used against FTX.  Humpy's website also touts his control of (at least) $100 million in cryptocurrency, much of which is traceable to his exploits of FTX, and invites investors to "swim with the whale" and join Humpy's crew of "Golden Boys" by buying Humpy's own cryptocurrency token:  "$GOLD":



57.     Using his Humpy alias, Meerun also has attacked other cryptocurrency lending protocols and platforms.  Most recently, Meerun executed a high-profile "governance attack" on

Compound Finance, a lending platform in which Meerun accumulated significant holdings of the protocol's governance token and then sought to divert more than $20 million in assets from other protocol users.  Meerun then used his leverage to force a "peace treaty" with Compound in which he received additional payments in exchange for not further seeking to exploit the protocol.[9]

58.     Meerun's criminal conduct is not limited to cryptocurrency exploits.  The Debtors' investigation has identified links between Meerun and a variety of money laundering operations and Ponzi schemes dating back more than a decade.  The Debtors also have identified extensive ties to Polish, Romanian, and Ukrainian organized crime networks, including groups linked to human trafficking, as well as to Islamic extremist networks linked to terrorist financing.

### CAUSES OF ACTION

#### COUNT ONE
#### COMMON LAW FRAUD UNDER ANTIGUAN LAW

59.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

60.     At all relevant times, FTX was a corporation incorporated in Antigua and Barbuda.

61.     The Defendant engaged in deceptive trading practices, including market manipulation through a network of accounts registered to aliases and stolen identities, to massively inflate the value of certain cryptocurrencies.

62.     In addition to this manipulative trading, the Defendant repeatedly exploited FTX's margin lending rules, using these artificially inflated cryptocurrency assets to improperly "borrow" hundreds of millions of dollars that Defendant never intended to repay.

---

[9]     *See*, *e.g.*, Vishal Chawla, *supra* n.2.

63.     The Defendant knew that as soon as his market manipulation stopped, the inflated value of his illiquid collateral would collapse, triggering margin requirements and risking liquidation unless Defendant returned the "borrowed" funds.  But the Defendant intentionally continued to exploit this system, increasing his "borrowing" and ultimately causing the accounts to be liquidated, resulting in hundreds of millions of dollars of losses.

64.     Plaintiffs suffered financial loss as a consequence.

**COUNT TWO**
**BREACH OF CONTRACT UNDER ANTIGUAN LAW**

65.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

66.     The Defendant registered numerous FTX accounts during the relevant period, and in each instance agreed to comply with and be bound by FTX's then-applicable terms of service in order to use the FTX exchange.

67.     At all relevant times, FTX's applicable terms of service prohibited market abuse and disorderly market conduct.  The Defendant breached FTX's terms of service by the manipulative trading described herein.

68.     At all relevant times, FTX's applicable terms of service prohibited the provision of false or misleading information in connection with account registration.  The Defendant repeatedly breached FTX's terms of service by registering FTX accounts using aliases, forged and/or stolen identities, and false address information.

69.     At all relevant times, FTX's applicable terms of service required customers to comply with the requirements of the margin trading program, including by maintaining sufficient collateral to meet FTX's maintenance margin requirement and satisfying all outstanding obligations in the event of a liquidation.  The Defendant repeatedly breached FTX's terms of

service by intentionally under-collateralizing various FTX accounts and failing to post collateral and satisfy outstanding obligations as required.

70.     As a direct and proximate result of the Defendant's breaches, Plaintiffs have been damaged, in an amount to be determined at trial.

**COUNT THREE**
**UNJUST ENRICHMENT**

71.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

72.     In the alternative to Count Two, as alleged above, the Defendant took advantage of the FTX margin lending rules by manipulating the price of certain cryptocurrencies, and received the benefit of cryptocurrency withdrawals worth hundreds of millions of dollars.  Accordingly, the Defendant has been enriched, while Plaintiffs and their creditors have been impoverished as a result.

73.     Under the circumstances as alleged herein, allowing the Defendant to retain the benefit of his cryptocurrency withdrawals would unjustly enrich the Defendant.  The unjust enrichment of the Defendant, to the detriment of Plaintiffs, has caused Plaintiffs damages.

74.     Should the Court find that Plaintiffs have no remedy at law, Plaintiffs seek recovery in equity.

**COUNT FOUR**
**PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**

75.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

76.     Between August 13, 2022 and November 11, 2022, Plaintiffs transferred to the Defendant cryptocurrency valued at $29,421,916 at the time of transfer.  These transfers were transfers of property of Plaintiffs.

77.     On information and belief, these transfers were made to the benefit of the Defendant.

78.     With respect to these transfers, the Defendant was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, the Defendant received such transfers for the benefit of a creditor or creditors of Plaintiffs.

79.     The transfers were made within 90 days of the Petition Date.

80.     The transfers were made while Plaintiffs were insolvent.

81.     The transfers enabled the Defendant to receive more than he would have received if:  (i) Plaintiffs' Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amount paid to the Defendant on account of the debt were determined by the Bankruptcy Code.

82.     The Defendant has not returned any portion of the cryptocurrency valued at $29,421,916.

83.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and has taken into account known or reasonably knowable affirmative defenses and believes these transfers are avoidable.

84.     Accordingly, these transfers should be avoided as preferential transfers pursuant to 11 U.S.C. § 547(b), and Plaintiffs may recover from the Defendant the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estate.

**COUNT FIVE**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**

85.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

86.     As alleged above, Plaintiffs are entitled to avoid each of these transfers addressed herein under § 547 of the Bankruptcy Code.

87.     Because Defendants are the initial transferees for whose benefit such transfers were made, Plaintiff may recover from all Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estate.

**COUNT SIX**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

88.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

89.     As alleged above, the Defendant is a transferees of transfers and recipient of obligations avoidable under 11 U.S.C. § 547 and a person from whom property is recoverable under 11 U.S.C. § 550.

90.     By reason of the foregoing facts and pursuant to 11 U.S.C. § 502(d), any claims of the Defendant, including claims of any aliases of the Defendant, known and unknown, that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiff the property transferred, or have paid Plaintiff the value of such transferred property, for which and to the extent the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

**COUNT SEVEN**
**OBJECTION TO CLAIM NO. 83997**

91.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

92.     On September 29, 2023, Claim No. 83997 was filed using an email address associated with the Defendant.

93.     No KYC information was submitted in connection with Claim No. 83997.

94.     Claim No. 83997 asserts a right to payment of $12,938,901.02 allegedly owed to the Defendant by Plaintiffs.

95.     Bankruptcy Rule 3001(a) requires that proofs of claim "conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a).

96.     The burden of persuasion for claims brought in bankruptcy always rests with the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). A claim is only considered *prima facie* valid if the claimant files his claim in accordance with Rule 3001, including by alleging facts to support a legal liability owed by the debtor to the claimant. *Id.*; Fed. R. Bankr. P. 3001(f); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del. 2016). Accordingly, where the claimant fails to allege any facts supporting legal liability or does not file his claim in accordance with Rule 3001, the claim is not entitled to *prima facie* validity, and the claimant must prove the validity of his claim by a preponderance of the evidence. *See* Fed. R. Bankr. P. 3001(f); *In re Trib. Media Co.*, 2017 WL 2622743, at *7 (D. Del. June 16, 2017), *aff'd*, 902 F.3d 384 (3d Cir. 2018); *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014); *In re Allegheny Int'l, Inc.*, 954 F.2d at 173-74.

97.     Claim No. 83997 does not set forth any facts to support the Defendant's claim.

98.     Claim No. 83997 also does not comply with Bankruptcy Rule 3001(a). The Defendant failed to fill in the required fields on the proof of claim form, specifically, the Defendant failed to assert any quantity of fiat or crypto held in his account as of November 11, 2022. In fact, the Defendant did not have a Petition Date balance to assert, and instead submitted email records confirming account deposits from February 2021.

99.   Accordingly, Claim No. 83997 is not entitled to *prima facie* validity.  Instead, the burden of proof reverts to the Defendant, who must prove the validity of the claim by a preponderance of the evidence.

100.   Plaintiff reserves any and all other defenses and rights to object to Claim No. 83997 on any other grounds.

**COUNT EIGHT**
**OBJECTION TO CLAIM NO. 81455**

101.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 58 as if fully set forth here.

102.   On September 29, 2023, Claim No. 81455 was filed with an email address associated with the Defendant and with an FTX account involved in the BAO/TOMO/SXP exploit.

103.   The FTX account associated with this email address was registered using an alias, a Polish address with a non-existent post code, and a phone number that had been included in an unrelated data breach and also had been associated with two other FTX accounts linked to the Defendant.

104.   Claim No. 81455 was filed not using the name of the alias associated with this FTX account, but rather using the Defendant's own name and residential address.  The Defendant also submitted what appear to be his own KYC materials in connection with this claim.

105.   Claim No. 81455 asserts a right to payment of $274,723.92 allegedly owed to Defendant by Plaintiffs.

106.   Bankruptcy Rule 3001(a) requires that proofs of claim "conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a).

107.    The burden of persuasion for claims brought in bankruptcy always rests with the claimant.  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  A claim is only considered *prima facie* valid if the claimant files his claim in accordance with Rule 3001, including by alleging facts to support a legal liability owed by the debtor to the claimant.  *Id.*; Fed. R. Bankr. P. 3001(f); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del. 2016).  Accordingly, where the claimant fails to allege any facts supporting legal liability or does not file his claim in accordance with Rule 3001, the claim is not entitled to *prima facie* validity, and the claimant must prove the validity of his claim by a preponderance of the evidence.  *See* Fed. R. Bankr. P. 3001(f); *In re Trib. Media Co.*, 2017 WL 2622743, at *7 (D. Del. June 16, 2017), *aff'd*, 902 F.3d 384 (3d Cir. 2018); *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014); *In re Allegheny Int'l, Inc.*, 954 F.2d at 173-74.

108.    Claim No. 81455 does not set forth any facts to support the Defendant's claim.

109.    Claim No. 81455 also does not comply with Bankruptcy Rule 3001(a).  The identification information submitted in connection with Claim No. 81455 does not match the identification information submitted when the FTX account in question was opened.

110.    Accordingly, Claim No. 81455 is not entitled to *prima facie* validity.  Instead, the burden of proof reverts to the Defendant, who must prove the validity of the claim by a preponderance of the evidence.

111.    Plaintiff reserves any and all other defenses and rights to object to Claim No. 81455 on any other grounds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

112.    Enter an order requiring the Defendant to pay Plaintiffs compensatory and/or punitive damages resulting from the Defendant's fraudulent misrepresentations;

113.     Enter an order requiring the Defendant to pay Plaintiffs compensatory damages for breach of the FTX Terms of Service and Updated Terms of Service, in an amount to be determined at trial, or in the alternative, enter an order requiring the Defendant to provide restitution to Plaintiffs for his unjust enrichment;

114.     Enter an order that the transfers addressed herein are avoidable preferences under 11 U.S.C. § 547;

115.     Award Plaintiffs (a) the return of property to the Debtors' estates that is the subject of the preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable fraudulent and preferential transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to the Defendants during the Preference Period);

116.     Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by the Defendant or any of his aliases, known or unknown, in these Chapter 11 Cases unless and until Defendants have turned over to Plaintiff the amount ordered as an award;

117.     Enter an order disallowing Claim No. 83997 and Claim No. 81455 in their entirety;

118.     Award Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs of suit; and

119.     Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: November 8, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      cobb@lrclaw.com
      mcguire@lrclaw.com
      robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email:  wheelers@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*