**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| -against- | Adv. Pro. No. 24-50198 (KBO) |
| NAWAAZ MOHAMMAD MEERUN, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
OR TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

*Page*

INTRODUCTION.................................................................................................1

BACKGROUND .................................................................................................5

ARGUMENT .......................................................................................................8

I.      THE COURT SHOULD DENY DEFENDANT'S MOTION TO COMPEL
        ARBITRATION ...................................................................................................8

        A.      Defendant Has Not Met His Burden To Establish Arbitrability..............................8

        B.      Arbitration Would Jeopardize The Objectives of The Bankruptcy Code.............11

II.     THE COURT SHOULD DENY DEFENDANT'S MOTION TO STAY
        THESE PROCEEDINGS.................................................................................13

III.    THE COMPLAINT STATES MULTIPLE CLAIMS UPON WHICH
        RELIEF CAN BE GRANTED..........................................................................16

        A.      The Complaint States a Claim for Fraud (Deceit) Under Antiguan Law ..............17

        B.      The Complaint States a Claim for Breach of Contract Under Antiguan Law .......20

        C.      The Complaint States a Claim for Unjust Enrichment ..........................................21

        D.      Section 547 of The Bankruptcy Code Applies Extraterritorially..........................23

IV.     THE COURT SHOULD DISALLOW DEFENDANT'S CLAIM..............................26

CONCLUSION ...................................................................................................26

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*3G Licensing, S.A.* v. *HTC Corp.*,
   2024 WL 1655361 (D. Del. Apr. 17, 2024).................................................................17

*360 Campaign Consulting, LLC* v. *Diversity Commc'n, LLC*,
   2020 WL 1320909 (Del. Ch. Mar. 20, 2020)...............................................................11

*In re APF Co.*,
   264 B.R. 344 (Bankr. D. Del. 2001) ......................................................................12, 13

*Alameda Rsch. Ltd.* v. *Giles*,
   2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) .......................................... 4, 19, 20

*Appforge, Inc.* v. *Extended Sys., Inc.*,
   2005 WL 705341 (D. Del. Mar. 28, 2005) ...................................................................16

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009).....................................................................................................16

*Begier* v. *I.R.S.*,
   496 U.S. 53 (1990).......................................................................................................25

*Bel-Ray Co., Inc.* v. *Chemrite (Pty) Ltd.*,
   181 F.3d 435 (3d Cir. 1999).........................................................................................17

*Black* v. *Montgomery Cnty.*,
   835 F.3d 358 (3d Cir. 2016).........................................................................................16

*Blackberry Ltd.* v. *PCS Wireless LLC*,
   2016 WL 1313161 (D.N.J. Apr. 4, 2016) ....................................................................17

*Core Progression Franchise LLC* v. *O'Hare*,
   2021 WL 6136183 (D. Colo. Dec. 29, 2021)...............................................................16

*In re EXDS, Inc.*,
   316 B.R. 817 (Bankr. D. Del. 2004) ............................................................................14

*In re FAH Liquidating Corp.*,
   572 B.R. 117 (Bankr. D. Del. 2017)..............................................................23, 24, 25

*Feeley* v. *NHAOCG, LLC*,
   62 A.3d 649 (Del. Ch. 2012)........................................................................................10

*In re Fleming Cos., Inc.*,
    325 B.R. 687 (Bankr. D. Del. 2005) ...................................................................14

*Franlogic Scout Dev., LLC* v. *Scott Holdings, Inc.*,
    2017 WL 2982396 (E.D. Pa. July 12, 2017)...........................................................8

*In re French*,
    440 F.3d 145 (4th Cir. 2006) ..........................................................................23, 25

*In re Gercke*,
    122 B.R. 621 (Bankr. D.D.C. 1991) ......................................................................14

*Hedges* v. *United States*,
    404 F.3d 744 (3d Cir. 2005)....................................................................................16

*Hickey* v. *Univ. of Pittsburgh*,
    81 F.4th 301 (3d Cir. 2023) ....................................................................................22

*Howard Delivery Serv., Inc.* v. *Zurich Am. Ins. Co.*,
    547 U.S. 651 (2006)................................................................................................13

*Jayson Co.* v. *Vertical Mkt. Software*,
    2006 WL 1374039 (D.N.J. May 18, 2006) ..............................................................9

*John Wyeth & Bro. Ltd.* v. *CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997)..................................................................................17

*In re Kaiser Aluminum Corp.*,
    456 F.3d 328 (3d Cir. 2006)....................................................................................25

*Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009).....................................................................................8

*Lepera* v. *ITT Corp.*,
    1997 WL 535165 (E.D. Pa. Aug. 12, 1997) ..........................................................14

*In re Lyondell Chem. Co.*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016)..............................................................24, 25

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) .......................................................................26

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) .......................................................................23

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................................24

*In re Nu Ride Inc.*,
  2024 WL 4376130 (Bankr. D. Del. Oct. 1, 2024) ...................................................9, 11, 14, 16

*Olympus Am., Inc.* v. *Cintas Corp. No. 2*,
  2021 WL 1248523 (D.N.J. Apr. 5, 2021) ..................................................................................9

*In re Paragon Offshore PLC*,
  588 B.R. 735 (Bankr. D. Del. 2018) ...............................................................................14, 15

*Parfi Holding AB* v. *Mirror Image Internet, Inc.*,
  817 A.2d 149 (Del. 2002) ..........................................................................................................10

*In re Pursuit Cap. Mgmt., LLC*,
  595 B.R. 631 (Bankr. D. Del. 2018) .................................................................10, 14, 16

*Stanley* v. *A Better Way Wholesale Autos, Inc.*,
  2018 WL 3872156 (D. Conn. Aug. 15, 2018) ........................................................................10

*In re Thorpe Insulation Co.*,
  671 F.3d 1011 (9th Cir. 2012) ...................................................................................11, 12, 13

*In re U.S. Lines, Inc.*,
  197 F.3d 631 (2d Cir. 1999) .....................................................................................................13

*In re White Mountain Mining Co., L.L.C.*,
  403 F.3d 164 (4th Cir. 2005) ...................................................................................................12

*In re Yellow Corp.*,
  2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024)........................................................11, 13

**Foreign Cases**

*Allianz Global Investors GmbH* v. *Barclays Bank plc*,
  [2022] EWCA Civ 353 ...............................................................................................................18

*Farol Holdings Limited* v. *Clydesdale Bank*,
  [2024] EWHC 593 (Ch)..............................................................................................................20

*Swynson Ltd* v. *Lowick Rose LLP*,
  [2018] AC 313 .............................................................................................................................18

*Vald Nielsen Holdings A/S* v. *Baldorino*,
  [2019] EWHC 1926 (Comm).....................................................................................................17

*Zurich Insurance Co plc* v. *Hayward*,
  [2017] AC 142 .............................................................................................................................20

**Statutes and Rules**

11 U.S.C. § 502(d) ................................................................................................8, 23

11 U.S.C. § 541 .......................................................................................................24, 25

11 U.S.C. § 547.......................................................................................................... *passim*

11 U.S.C. § 548 ...................................................................................................23, 24, 25

11 U.S.C. § 550...............................................................................................7, 23, 24, 25

Fed. R. Civ. P. 9(b) .................................................................................................17

Fed. R. Civ. P. 12(b)(6)...........................................................................................2, 3, 16

Fed. R. Civ. P. 44.1 .................................................................................................17

Fed. R. Bankr. P. 3007(b) ........................................................................................8, 26

**INTRODUCTION**

Throughout 2021 and 2022, defendant Mohammad Nawaaz Meerun ("Defendant") defrauded FTX Trading Ltd. ("FTX") and Alameda Research Ltd. ("Alameda," and together with FTX and its other affiliates, the "FTX Group") out of hundreds of millions of dollars through a series of massive market manipulation schemes.  Each of those fraudulent exploits involved the following three steps:  First, Defendant used multiple FTX exchange accounts to accumulate enormous positions in illiquid tokens to artificially drive up their prices. Second, Defendant used those artificially inflated tokens as collateral to borrow money from FTX's margin trading program.  Third, Defendant withdrew the "borrowed" funds and ceased his price manipulation, at which point the value of his collateral crashed, leaving FTX and Alameda holding the bag.  Defendant executed this fraudulent scheme against FTX at least three times, using dozens of different aliases to evade detection and circumvent FTX's attempts to freeze his accounts, and ultimately walked away with hundreds of millions of dollars in stolen funds.  Moreover, the FTX Group ultimately was forced to take over Defendant's remaining exchange positions after Defendant fled, causing the FTX Group to suffer hundreds of millions in additional losses.  Adding insult to injury, following the FTX Group's collapse in November 2022, Defendant submitted two claims for recovery of even more stolen funds from the FTX Recovery Trust (the "Plaintiff" or "Trust").  It therefore comes as no surprise that now that his scheme has come to light, Defendant is attempting to avoid appearing in this Court, and to evade (or, at a minimum, to delay) subjecting himself to jurisdiction in the United States.

Defendant now seeks to compel Plaintiff to arbitrate its claims for fraud, breach of contract, and unjust enrichment (the "Common Law Claims") in Singapore, and to stay Plaintiff's Bankruptcy Code-based claims (the "Bankruptcy Law Claims")—which he concedes must go forward in this Court—while that arbitration is pending.  (Mot. at 7 n.10, 13-14.)  In the

alternative, Defendant moves to dismiss Plaintiff's claims for failure to state a claim pursuant to Rule 12(b)(6). (Mot. at 14-21.) The Court should deny Defendant's motion (the "<u>Motion</u>") in its entirety.

The Court should not compel arbitration of the Common Law Claims. As a threshold matter, Defendant fails to meet his burden of establishing that a valid arbitration agreement governs any of Plaintiff's claims. Defendant's Motion cites two different arbitration provisions in two different documents, which refer to arbitration of certain claims in different locations and under different rules and substantive laws. FTX's terms of service that were in place prior to May 13, 2022 (the "<u>2020 Terms of Service</u>," [Adv. D.I. 13-1]) refer to arbitration in, and governed by the laws of, Antigua and Barbuda. (2020 Terms of Service § 27.) The terms of service in place beginning May 13, 2022 (the "<u>2022 Terms of Service</u>," [Adv. D.I. 13-2], and together with the 2020 Terms of Service, the "<u>Terms of Service</u>") refer to arbitration in Singapore, governed by the laws of England. (2022 Terms of Service §§ 38.11-38.12.) Defendant asks this Court to apply only the 2022 Terms of Service, which are inapplicable to Plaintiff's claims relating to any of Defendant's conduct prior to May 13, 2022. Thus, if this Court were to grant Defendant's Motion (and it should not), it should compel arbitration only to the extent that Plaintiff's claims relate to Defendant's conduct after that date.

To the extent that Defendant (belatedly) attempts to argue that he is in fact seeking to compel two separate arbitrations pursuant to different laws and rules in two different tribunals, neither of which would dispose of all of Plaintiff's claims, his Motion merely illustrates that arbitration of this matter is unworkable and would frustrate the Bankruptcy Code's core objectives of centralization of disputes, avoidance of piecemeal litigation, and efficient resolution of claims. Indeed, because Defendant concedes that the Bankruptcy Law

Claims are not arbitrable and must be heard by this Court, his Motion, if granted, would result in litigation in as many as *three* separate forums. Defendant's Motion is thus a clear recipe for piecemeal litigation, inefficiency, delay, and potentially inconsistent or incomplete findings that in any event would need to be reconciled before this Court. Moreover, the Terms of Service are key documents in these bankruptcy proceedings that are relevant to thousands of creditor claims and disputes. Any interpretation of the Terms of Service should be done by this Court, not in one-off arbitration proceedings with potentially inconsistent results. Defendant also fails to explain why a claim for unjust enrichment, which he contends is expressly contingent on there being no governing contract, should be subject to any arbitration provision at all. In short, all of Plaintiff's claims belong in this Court.

Defendant's motion to stay the claims he concedes are not arbitrable pending arbitration is a desperate attempt to delay appearing in this forum. Plaintiff's Bankruptcy Law Claims are independent of its Common Law Claims, and must be resolved in this Court regardless of how the Court rules on Defendant's Motion. There is no efficiency to be gained by staying the Bankruptcy Law Claims. Doing so would only prejudice Plaintiff's legitimate creditors by prolonging the time it takes for the Trust to recover damages for Defendant's egregious fraud.

Defendant's 12(b)(6) arguments are also unpersuasive. They ignore the well-pled allegations of the Complaint, the well-known affiliation between FTX and Alameda, and the established law of this Circuit. Defendant suggests that because Alameda functioned as a backstop liquidity provider and committed funds to cover FTX's losses, FTX somehow was not harmed by Defendant's fraudulent conduct. But, conveniently, Defendant claims that ***Alameda also cannot recover*** because it supposedly did not rely on Defendant's fraudulent

misrepresentations or contract with Defendant directly.  Defendant essentially asks this Court to rule that no matter how egregious his misconduct was, there somehow is no one who can recover.  This result is both unjust and incorrect.  It is by now well established that Samuel Bankman-Fried, Gary Wang, Nishad Singh, and Caroline Ellison (collectively, the "FTX Insiders") used their near-total control over the FTX Group's pre-petition operations to perpetrate an unprecedented fraud, commingling and misusing customer and corporate assets for speculative trading, the purchase of luxury properties, political and other "donations," and venture investments.  *See, e.g.*, *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].  The fact that the FTX Insiders shuffled the losses caused by Defendant among the various entities they controlled does not render those losses unrecoverable, especially in light of this Court's prior treatment of the various FTX Group entities as a single, consolidated entity.  *See Alameda Rsch. Ltd.* v. *Giles*, 2024 WL 4562675, at *6.  (Bankr. D. Del. Oct. 23, 2024).  Under Antiguan law, the law under which the Common Law Claims were pled in the Complaint, both FTX and Alameda suffered compensable losses and may recover damages as a result of Defendant's conduct (though, to be clear, Plaintiff is not contending that it may recover the same damages twice).

Finally, Defendant's motion entirely ignores Plaintiff's objections to his proofs of claim (Claim Nos. 83997 and 81455).  This Court should enter an order disallowing Claim No. 81455, as Defendant has now waived the right to respond to Plaintiff's objection.[1]

---

[1]      Count Seven brings an objection to Claim No. 83997.  However, on December 11, 2024, Claim No. 83997 was expunged by Court order [D.I. 28688].  Count Seven is thereby mooted.

**BACKGROUND**

Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses, of which Defendant was an active customer and user.  (Compl. ¶ 25.)  All FTX customers were required to agree to terms of service before using the FTX exchange, which were updated and amended throughout the active life of the FTX Group.  Both the 2020 and 2022 Terms of Service provide that affiliates (as defined therein) of FTX were third party beneficiaries of the Terms' provisions.  (2020 Terms of Service § 36; 2022 Terms of Service § 38.9.1.)

FTX offered customers the opportunity to participate in a margin trading program as both borrowers and lenders.  Customers who opted into the program could agree to lend their assets out to other customers in exchange for a fee, and to borrow from other customers using the assets in their FTX accounts as collateral.  (Compl. ¶¶ 26-27, 69.)  FTX's systems automatically matched borrowers with lenders, and were designed to provide lenders protection against losses by continuously monitoring the prices of borrowers' collateral and automatically liquidating that collateral if its value dropped too low.  (Compl. ¶¶ 27 n.7, 38; *see* 2022 Terms of Service §§ 2.4, 2.5.2.)

In January 2021, Defendant began laying the groundwork for his exploit of FTX's margin trading program, which ultimately would defraud FTX and Alameda out of hundreds of millions of dollars.  (Compl. ¶¶ 4, 10.)  Defendant orchestrated his scheme three times: (1) between January and March 2021 using the BTMX and MOB tokens (the "BTMX/MOB Exploit"); (2) between August and December 2021 using BAO, TOMO, and SXP tokens (the "BAO/TOMO/SXP Exploit"); and (3) between January 2022 and September 2022 using KNC tokens (the "KNC Exploit").  (Compl. ¶¶ 28-41, 42-47, 48-54.)

Each exploit followed the same pattern:  Defendant amassed enormous positions in illiquid tokens to artificially drive up their prices, used those artificially inflated tokens as collateral to borrow money from FTX's margin trading program, and then withdrew the "borrowed" funds before the price of his collateral dropped precipitously.  (Compl. ¶ 4.)  FTX's systems were not equipped to deal with Defendant's fraudulent schemes.  When the value of Defendant's collateral began to fall, Defendant's account could not be easily liquidated because his exposures were far too risky and his deficit was far too large for any of the so-called "backstop liquidity providers" unaffiliated with FTX to take on.  (Compl. ¶¶ 38-39.)  As a result, Alameda stepped in as backstop liquidity provider, taking over and unwinding Defendant's positions and racking up hundreds of millions of dollars in losses in the process.  (Compl. ¶¶ 39, 41, 47, 52.)

Defendant began his BTMX/MOB Exploit using his primary FTX account and one other account that he controlled.  (Compl. ¶ 36.)  FTX did not become suspicious of the scheme until late March 2021, at which point FTX placed Defendant's account "in reduce-only mode" to limit his ability to transact.  (Compl. ¶¶ 33-34.)  But that was not enough—Defendant continued to evade FTX's restrictions, and succeeded in withdrawing hundreds of millions of dollars.  (Compl. ¶ 35.)  When FTX personnel informed Defendant that he needed to provide additional collateral to cover his positions, Defendant simply ignored them and continued withdrawing.  (Compl. ¶¶ 37-38.)  FTX finally froze Defendant's accounts on March 28, 2021.  (Compl. ¶¶ 37-38.)  As of March 28, 2021, Defendant had withdrawn a total of $450 million from FTX as part of his BTMX/MOB Exploit, including more than $150 million on March 27 alone.  (Compl. ¶ 35.)

Because his primary accounts were frozen as a result of the BTMX/MOB Exploit, Defendant needed new accounts to carry out his BAO/TOMO/SXP Exploit. Between August and December 2021, Defendant fraudulently opened and operated well over *eighty* accounts, using them to perpetrate his manipulative trading strategy. (Compl. ¶ 43.) Ultimately, FTX froze those accounts as well. (Compl. ¶ 47.) But the damage had been done; Defendant had already made off with more than $200 million in funds. (Compl. ¶ 47.)

By the time FTX closed down the BAO/TOMO/SXP exploit in December 2021, Defendant had already started working on his KNC Exploit. (Compl. ¶ 48.) As with his prior exploits, Defendant executed the KNC Exploit using fraudulent FTX accounts and similar manipulative trading patterns. (Compl. ¶¶ 48-52.) As a result, Defendant made off with an additional $68 million by September 2022. (Compl. ¶ 52.)

Between August 13 and November 11, 2022, Defendant managed to withdraw $29 million worth of digital assets from FTX accounts that he controlled. (Compl. ¶¶ 53, 76.) FTX and Alameda faced a severe liquidity crisis and filed for Chapter 11 bankruptcy on an emergency basis on November 11 and 14, 2022 (the "Chapter 11 Cases"). (Compl. ¶ 25.) Defendant filed two proofs of claim in the Chapter 11 Cases totaling approximately $13.2 million, both of which seek to recover the value of customer accounts that were used for Defendant's fraudulent exploits. (Compl. ¶¶ 54, 92, 102.)

Plaintiff filed this Complaint on November 8, 2024,[2] bringing claims for fraud, breach of contract, and unjust enrichment, as well as claims under sections 547(b), 550(a)(1), and

---

[2]     The Complaint was originally filed in these Chapter 11 Cases by FTX and Alameda, two of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor"). On October 8, 2024, the Court entered an order confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D. I. 26404] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127] (the "Plan Effective Date"). Upon the Plan Effective Date, all assets of the Debtors, including all claims and causes of action,

502(d) of the Bankruptcy Code.  Plaintiff also objects to Defendant's Claim No. 81455 pursuant to Federal Rule of Bankruptcy Procedure 3007(b).

## ARGUMENT

### I.    THE COURT SHOULD DENY DEFENDANT'S MOTION TO COMPEL ARBITRATION.

#### A.    Defendant Has Not Met His Burden To Establish Arbitrability.

"[B]efore compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).  "It is the movant's burden" to demonstrate both prerequisites. *Franlogic Scout Dev., LLC* v. *Scott Holdings, Inc.*, 2017 WL 2982396, at *4 (E.D. Pa. July 12, 2017).  The "presumption in favor of arbitration 'does not apply'" to this inquiry. *Kirleis*, 560 F.3d at 160.

As an initial matter, Defendant has failed to establish that a valid agreement to arbitrate governs Plaintiff's Common Law Claims.  Defendant cites two arbitration clauses—one in the 2020 Terms of Service and another in the 2022 Terms of Service—and states, based on a clear misreading of the Terms of Service, that "the arbitration clause in the 2022 FTX TOS is controlling."  (Mot. at 7 n.10.)[3]  On that basis, Defendant moves to compel arbitration in Singapore pursuant to the 2022 Terms of Service.  But the 2022 Terms of Service do not say that they are "controlling," and Defendant does not explain why they would be.  The 2020 Terms of Service by their own terms remained in effect and governed transactions that predated the 2022

---

were transferred to and vested in the FTX Recovery Trust.  Accordingly, Plaintiff has the authority to prosecute this Adversary Proceeding.

[3]    *See also Motion to Stay Discovery Pending a Ruling on Defendant Mohammad Nawaaz Meerun's Motion to Compel* [Adv. D.I. 15] (discussing only rules of Singapore International Arbitration Centre).

Terms of Service.   (2020 Terms of Service § 28 (any amendments "shall apply *on a going-forward basis* with respect to transactions initiated after the posting date" of the revised agreement) (emphasis added); 2022 Terms of Service § 22.1 (same); 2020 Terms of Service § 30 ("[A]ll rights and obligations of the parties . . . will survive [] termination" of the Terms of Service).)   Defendant's actions on the FTX exchange prior to May 13, 2022, when the 2022 Terms of Service were posted, were subject to the 2020 Terms of Service.  The 2022 Terms of Service only became applicable after "the first time" Defendant transacted on the FTX exchange "after the initial posting" of those terms.  (2020 Terms of Service § 28; 2022 Terms of Service § 22.)   Defendant—who bears the burden of establishing the applicability of the arbitration provision—does not acknowledge these provisions and does not even attempt to explain precisely which of Plaintiff's claims (in his view) arose after May 13, 2022 and therefore may be subject to the 2022 Terms of Service as opposed to the 2020 Terms of Service.   And significantly, although the Motion purports to "address[]" the arbitration provision in the 2020 Terms of Service (Mot. at 7 n.10), Defendant does not ask the Court to send any aspect of this matter to arbitration in Antigua and Barbuda.

Thus, under Defendant's interpretation, it is at best "unclear which arbitral forum should hear which claims."  *In re Nu Ride Inc.*, 2024 WL 4376130, at *11 (Bankr. D. Del. Oct. 1, 2024) (declining to "require arbitration in two different fora").   This lack of clarity is fatal. "Without a clear answer as to which contract's language must be enforced here, the Court cannot determine whether the parties must be compelled to conduct any potential arbitration in a specific forum, and therefore cannot properly rule on the motion presently before it."  *Olympus Am., Inc.* v. *Cintas Corp. No. 2*, 2021 WL 1248523, at *6 (D.N.J. Apr. 5, 2021) (denying motion to compel arbitration); *see also Jayson Co.* v. *Vertical Mkt. Software*, 2006 WL 1374039, at *4

(D.N.J. May 18, 2006) (courts will "refus[e] to apply a forum selection clause from one contract between the parties to a dispute arising out of a second contract" (citation omitted)); *Stanley* v. *A Better Way Wholesale Autos, Inc.*, 2018 WL 3872156, at *5, *8 (D. Conn. Aug. 15, 2018) (denying motion to compel arbitration where two contracts at issue "support two different readings of the appropriate arbitral forum").

      To further complicate matters, Defendant argues that **Delaware law** applies to the Common Law Claims.  (Mot. at 14 n.15.)  But under Delaware law, the arbitration provisions would not call for arbitration of Plaintiff's fraud claim because that claim is "not based on provisions" of the contract, but rather, on "obligations arising under state law."  *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. 631, 672 (Bankr. D. Del. 2018).  Even in the face of broad arbitration language, a tort claim brought under Delaware common law is outside the scope of an arbitration clause if the claim is an "independent cause of action" that "could be brought had the parties not signed a contract."  *Feeley* v. *NHAOCG, LLC*, 62 A.3d 649, 656 (Del. Ch. 2012); *see Parfi Holding AB* v. *Mirror Image Internet, Inc.*, 817 A.2d 149, 157 (Del. 2002) (declining to compel arbitration because claims "would be assertable had there been no [contract]").

      Here, Plaintiff's fraud claim is independent of the Terms of Service because Defendant's obligations not to manipulate the market or steal borrowed funds exist regardless of any provision in the Terms of Service.  That Plaintiff's fraud claim implicates some of the same underlying facts as its breach of contract claim does not change this outcome.  *See Feeley*, 62 A.3d at 656 ("common factual underpinnings did not warrant arbitration" where tort claims "'arise from some or all of the same facts' that provided the basis for arbitrable breach of contract claims") (discussing *Parfi Holding*, 817 A.2d at 156-57).  Nor is there any indication from the plain language of either version of the Terms of Service that the arbitration provision

was meant to cover fraudulent conduct.  *See In re Nu Ride Inc.*, 2024 WL 4376130, at *9 (arbitration clause covering claims "arising out of or relating to" contract not applicable to tort claims because it "does not expressly include tort claims").[4]

Moreover, with respect to Plaintiff's unjust enrichment claim, Defendant elsewhere argues that the claim is viable only to the extent that there *is no applicable governing contract*.  (Mot. at 17.)  If Defendant's argument is correct, then the unjust enrichment claim by definition cannot arise out of the Terms of Service or be subject to any arbitration provisions therein.  *See 360 Campaign Consulting, LLC* v. *Diversity Commc'n, LLC*, 2020 WL 1320909, at *9 (Del. Ch. Mar. 20, 2020) (unjust enrichment claim not arbitrable because "an unjust enrichment claim only applies in the event that the [contract] does not govern," and thus does not "relate to any contract right").

## B.    Arbitration Would Jeopardize The Objectives of The Bankruptcy Code.

Even where a valid arbitration clause exists, a court may decline to order arbitration where, as here, arbitration would jeopardize the objectives of the Bankruptcy Code. *In re Yellow Corp.*, 2024 WL 1313308, at *8 (Bankr. D. Del. Mar. 27, 2024).  In making this determination, "[a] bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code."  *In re Nu Ride Inc.*, 2024 WL 4376130, at *12 n.95 (citation omitted).  Here, arbitration of Plaintiff's Common Law Claims would be inconsistent with at least three fundamental purposes of the Bankruptcy Code.

*First*, arbitration of the Common Law Claims would frustrate the Bankruptcy Code's core objective of "protect[ing] creditors and reorganizing debtors from piecemeal litigation."  *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1022 (9th Cir. 2012).  Taken to its

---

[4]    In fact, the 2022 Terms of Service explicitly *exclude* fraud from its indemnification provision. (2022 Terms of Service § 30.1.2.)

extreme, Defendant's position would require the parties to litigate the issues of this Adversary Proceeding separately in three different forums around the globe: (1) Plaintiff's non-arbitrable claims would be litigated in this Court under U.S. law; (2) Plaintiff's claims arising from Defendant's pre-May 2022 conduct call for arbitration in, and governed by the laws of, Antigua and Barbuda (2020 Terms of Service § 27); and (3) Plaintiff's claims arising from Defendant's post-May 2022 conduct call for arbitration in Singapore, governed by the laws of England. (2022 Terms of Service §§ 38.11-38.12.) This result would undoubtedly undermine the fundamental tenet of centralized resolution of claims, leading to piecemeal litigation that would require the Trust "to expend limited resources and energies pursuing similar cases in several geographically diverse fora," and in turn, frustrate the ability of creditors to recover fully on their claims. *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001); *see In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 170 (4th Cir. 2005) ("London arbitration was inconsistent with the purpose of the bankruptcy laws to centralize disputes" and "would have substantially interfered with the debtor's efforts to reorganize").

Moreover, the Terms of Service are central documents in the broader FTX Chapter 11 Cases that have already been subject to significant litigation in this Court,[5] and may play a role in future proceedings, including claim allowance disputes. Allowing not one, but *two* different arbitral tribunals to interpret the terms of this document "risk[s] the arbitrator[s] 'tread[ing] upon matters that [a]re properly decided by the Bankruptcy Court.'" *In re Thorpe*

---

[5]      *See, e.g.*, *Findings of Fact, Conclusions of Law and Order Confirming The Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. And its Debtor Affiliates* [D.I. 26404] ¶ 39; Plan ¶ 5.2; *FTX Trading Ltd. et al* v. *Burgess et al*, Adv. Pro. No. 23-50585 [Adv. D.I. 25, 34]; *Alameda Research LLC et al* v. *FTX Digital Markets Ltd et al*, Adv. Pro. No. 23-50145 [Adv. D.I. 29, 39]; *Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply To, or in the Alternative for Relief From Stay for Filing of the Application in the Supreme Court of the Commonwealth of the Bahamas Seeking Resolution of Non-US Law and Other Issues* [D.I. 1192].

*Insulation Co.*, 671 F.3d at 1023 n.10; *see In re U.S. Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999) (bankruptcy court appropriately retained jurisdiction over proceedings despite arbitration clause where interpretation of pre-bankruptcy insurance contracts would impact other core bankruptcy functions).    Indeed, Defendant himself contends that "the factual underpinnings" of the purportedly arbitrable claims "overlap with" the Bankruptcy Law Claims, and thus risk inconsistent findings in this proceeding.  (Mot. at 13-14); *see In re Thorpe Insulation Co.*, 671 F.3d at 1019 (declining to compel arbitration where arbitrable and non-arbitrable claims "overlap[] factually").

> *Second*, arbitration would be inconsistent with "[t]he efficient resolution of claims and the conservation of the bankruptcy estate assets," which is another "integral purpose of bankruptcy." *In re APF Co.*, 264 B.R. at 364.  As described above, arbitration of Plaintiff's Common Law Claims would result in fragmented litigation in three different forums across the globe.  This process would not only be expensive but also time-consuming, thereby delaying payments to legitimate creditors.  There is simply no reason to frustrate this fundamental goal of the Bankruptcy Code, which "concerns more than the mere private rights of individuals to an arbitration agreement which was the preeminent concern of Congress in passing the FAA." *Id.*

> *Third*, enforcing the arbitration clauses would also disrupt "equality of distribution," *In re APF Co.*, 264 B.R. at 364, and "prejudice the interests of other creditors," *In re Yellow Corp.*, 2024 WL 1313308, at \*13.  "[T]he equal distribution objective underlying the Bankruptcy Code" is threatened where the treatment of one creditor "diminishes the recovery of other claimants." *Howard Delivery Serv., Inc.* v. *Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006). Here, Defendant fraudulently "borrowed" millions of dollars from the Debtors that Plaintiff is endeavoring to recover in order to pay legitimate creditors.  He should not be allowed to invoke

arbitration to evade and delay that process. *In re Gercke*, 122 B.R. 621, 632 (Bankr. D.D.C. 1991) ("the interests of all creditors of [debtor's] estate in an equality of distribution" takes priority over "mandatory" contractual provisions that would result in "lengthy and expensive" foreign litigation which threatens to drain estate assets).

## II.   THE COURT SHOULD DENY DEFENDANT'S MOTION TO STAY THESE PROCEEDINGS.

Courts have discretion "to stay or not stay litigation pending arbitration," *In re Nu Ride Inc.*, 2024 WL 4376130, at *12 n.95, and "ought to be cautious" in exercising such discretion, *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. at 671.  The Court should not exercise its discretion to stay proceedings here, and neither of Defendant's two arguments for a stay compel a contrary result.

*First*, Defendant argues that Plaintiff's Bankruptcy Law Claims "are *unambiguously* intertwined" with Plaintiff's Common Law Claims, thereby entitling Defendant to a stay of *all* claims pending arbitration.  (Mot. at 13 (emphasis in original).)  But the presence of "factually intertwined" arbitrable and non-arbitrable claims "does not suffice to require a stay." *In re Paragon Offshore PLC*, 588 B.R. 735, 761 (Bankr. D. Del. 2018).[6]  Instead, courts look to whether the arbitrable claims "predominate" or "overwhelm" the non-arbitrable claims, or whether litigation of the non-arbitrable claims are dependent on the arbitrable ones.  *Id.*; *Lepera* v. *ITT Corp.*, 1997 WL 535165, at *8 (E.D. Pa. Aug. 12, 1997) (declining to stay non-arbitrable claims even where "all of Plaintiff's claims arise from the same incidents").

---

[6]     Both cases cited by Defendant on this point are distinguishable.  In *In re EXDS, Inc.*, 316 B.R. 817 (Bankr. D. Del. 2004), five of the six substantive claims were arbitrable, and the court concluded that resolution of those five claims could "contribute to the resolution of the issues raised" by the remaining claim.  Similarly, in *In re Fleming Cos., Inc.*, 325 B.R. 687 (Bankr. D. Del. 2005), the non-arbitrable Bankruptcy Code claims were "all dependent on the Plaintiffs' succeeding on their fraud and contract claims" that were subject to arbitration, whereas here, none of the Bankruptcy Law Claims is outcome-dependent on any of the Common Law Claims.

As discussed *supra*, Defendant concedes that five of Plaintiff's eight causes of action are appropriately before this Court (Mot. at 12 n.14), and provides no basis for arbitrating two of the remaining three claims. Thus, even if one or more of Plaintiff's Common Law Claims were dismissed in favor of arbitration (they should not be), "the claims that predominate are clearly those that remain in this Court." *In re Paragon Offshore PLC*, 588 B.R. at 761-62 (finding "no reason to delay litigation of the majority of the claims"). Nor is the resolution of Plaintiff's Bankruptcy Law Claims in any way "contingent upon" Plaintiff succeeding on its Common Law Claims. *Id.* at 762 (declining to stay non-arbitrable claim because it was not "contingent upon the Trust succeeding on its [arbitrable] claim"). Whether the relevant pre-petition transfers qualify as preferential transfers does not turn on whether those transfers were fraudulent or whether they violated the Terms of Service. With respect to Plaintiff's claim objection, Defendant's proof of claim is invalid because Defendant failed to properly complete the requisite Know Your Customer requirements (post-petition) (Compl. ¶¶ 104, 109), and thus Plaintiff's claim objection also does not turn on the success of the Common Law Claims, which relate to Defendant's pre-petition conduct.[7]

*Second*, Defendant argues that the inefficiency of piecemeal litigation justifies a stay of all non-arbitrable claims. (Mot. at 14.) But as noted above, staying this Adversary Proceeding pending arbitration will not obviate the need to engage in piecemeal litigation; it will only delay it, which inherently harms creditors. Moreover, it is well settled that "judicial efficiency alone is not a sufficient reason for a court to 'refuse to exercise its jurisdiction in favor

---

[7]  This conclusion remains even if the Court were to order arbitration of the breach of contract claim but retain jurisdiction over the fraud and unjust enrichment claims. In that scenario, only one of Plaintiff's eight claims would be subject to arbitration, and the remaining claims do not turn on any interpretation of either the 2020 Terms of Service or the 2022 Terms of Service, or a decision about whether Defendant breached one or both of them.

of proceedings in an alternative forum.'" *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. at 671.

Courts will thus decline to stay litigation pending a related arbitration unless the burden of

proceeding in tandem would be "insurmountable." *In re Nu Ride Inc.*, 2024 WL 4376130,

at *12. Here, no such insurmountable burden exists. Although litigation in two (or three)

different fora would be a challenge, that challenge does not justify the burden to the estate that

would result from any further delay in litigating the Bankruptcy Law Claims.[8] If anything, the

parties may benefit from simultaneous discovery on the facts, rather than repeating discovery

processes multiple times. *See Core Progression Franchise LLC* v. *O'Hare*, 2021 WL 6136183,

at *5 (D. Colo. Dec. 29, 2021) (noting that "the parties may use whatever discovery obtained [in

litigation] in the arbitration proceedings," and vice versa).

## III.    THE COMPLAINT STATES MULTIPLE CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

Under Federal Rule of Civil Procedure 12(b)(6), Defendant bears the burden of

demonstrating that Plaintiff has not stated a claim upon which relief can be granted.

*Hedges* v. *United States*, 404 F.3d 744, 750 (3d Cir. 2005). In ruling on a motion pursuant to

Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the

light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358,

364 (3d Cir. 2016) (citation omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)

(plaintiff must allege "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged").

---

[8]    The only case Defendant cites to the contrary, *Appforge, Inc.* v. *Extended Sys., Inc.*, 2005 WL 705341 (D. Del. Mar. 28, 2005), involved "similar, if not identical" claims brought against several defendants, where only claims against one of those defendants were arbitrable and the remaining defendants "submit to be bound by any factual adjudications in the arbitration." *Id.* at *10. Such efficiency concerns are not present here.

### A.      The Complaint States a Claim for Fraud (Deceit) Under Antiguan Law.

To state a claim for deceit (the equivalent of fraud) under Antiguan law,[9] Plaintiff

must sufficiently allege that:

> (i) the defendants made false representations to the claimants; (ii) the defendants
> knew the representations to be false, or had no belief in their truth, or were
> reckless as to whether they were true or false; (iii) the defendants intended the
> claimants to rely on the representations; (iv) the claimants did rely on the
> representations; and (v) as a result the claimants have suffered loss and damage.

(Houseman Decl., Ex. D (*Vald Nielsen Holdings A/S* v. *Baldorino* [2019] EWHC 1926 (Comm))

at 131.)[10]

Defendant concedes that Plaintiff has met its burden as to the first three

elements,[11] and attempts only to argue that Plaintiff has not pled (a) damages to FTX, because

---

[9]     After ten pages of argument that the arbitration provisions in the Terms of Service govern
Plaintiff's Common Law Claims and this entire proceeding should be stayed as a result,
Defendant appears to ignore the choice of law provisions contained in both versions of the Terms
of Service.  Instead, Defendant incorrectly argues that Delaware law applies because "Plaintiffs
have not proven the applicability or substance of [Antiguan] law."  (Mot. at 14 n.15.)  The
Complaint brings the Common Law Claims under Antiguan law, which is all that the Federal
Rules of Civil Procedure require.  *See* Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue
about a foreign country's law must give notice by a pleading or other writing.").  The cases cited
by Defendant are inapposite—none were decided at the motion to dismiss phase, and all were
evaluated under different, inapplicable standards.  *See 3G Licensing, S.A.* v. *HTC Corp.*, 2024
WL 1655361, at *2 (D. Del. Apr. 17, 2024) (applying forum law after jury verdict and final
judgment entered); *Bel-Ray Co., Inc.* v. *Chemrite (Pty) Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999)
(applying forum law after summary judgment stage); *John Wyeth & Bro. Ltd.* v. *CIGNA Int'l
Corp.*, 119 F.3d 1070, 1071, 1073-74 (3d Cir. 1997) (same).

[10]    Citations to "Houseman Decl." refer to the accompanying Declaration of Stephen Houseman KC,
and citations to "Ex. _" refer to the exhibits attached thereto.  Courts may look to "any relevant
material or source" in deciding questions of foreign law on a motion to dismiss, including
affidavits from foreign lawyers.  Fed. R. Civ. P. 44.1; *Blackberry Ltd.* v. *PCS Wireless LLC*, 2016
WL 1313161, at *3 (D.N.J. Apr. 4, 2016).  Mr. Houseman is an English barrister and member of
Essex Court Chambers in London since 1997.  (Houseman Decl. ¶¶ 1, 4.)  He specializes in
international commercial and modern chancery disputes and has been admitted to the Eastern
Caribbean Supreme Court (Antigua & Barbuda; St. Lucia) since 2018.  (Houseman Decl. ¶¶ 4, 5,
Ex. A (CV of Stephen Houseman KC).)

[11]    Defendant also does not dispute that the Complaint pleads Plaintiff's fraud claims with the
particularity required by Federal Rule of Civil Procedure 9(b).

Alameda purportedly covered FTX's losses, or (b) reliance by Alameda on Defendant's misrepresentations.  (Mot. at 15.)  Both arguments fail.

*First*, the Complaint plainly alleges that FTX sustained direct losses as a result of Defendant's manipulative trading and fraudulent conduct (Compl. ¶ 64), and clearly articulates that Defendant's actions caused immediate harm to FTX by creating massive holes in its balance sheet (Compl. ¶¶ 35, 38, 41, 47, 50, 52).  The fact that the FTX Insiders caused Alameda to step in and take over Defendant's positions after he absconded (none of which Defendant contests) does not mean that FTX suffered no losses as a result of Defendant's fraudulent activity.

Under Antiguan law, Alameda's assumption of Defendant's positions is considered a collateral benefit to FTX that "arose independently of the circumstances giving rise to the loss" and is not treated as "making good" on FTX's losses.  (Houseman Decl. ¶ 20(d), Ex. P (*Swynson Ltd* v. *Lowick Rose LLP* [2018] AC 313) at 11.)  Similar circumstances arise in the insurance context, where an insurer provides reimbursement to a person who suffers a loss pursuant to an arrangement that is separate from whatever caused the underlying loss.  (Houseman Decl. ¶ 20(e).)  It is black letter law that a victim may still recover from a tortfeasor even if that victim recoups some of his losses through insurance or through a gift, as those payments arose independently from and collateral to the loss.  (Houseman Decl. ¶ 20(e).)  In such circumstances, the "benefit" to the claimant is viewed as having been "derived from a separate transaction" and is thus "tantamount to making good the loss from the claimant's own resources."  (Houseman Decl. ¶ 20(e), Ex. Q (*Allianz Global Investors GmbH* v. *Barclays Bank plc* [2022] EWCA Civ 353) at 32.)  "In considering the application of those principles, the court should have in mind that they are derived from concepts of justice, reasonableness and public policy."  (Houseman Decl. ¶ 20(e), Ex. Q at 32.)  Alameda's assumption of Defendant's

positions thus cannot be treated as having eliminated FTX's losses for purposes of establishing the "loss" element of deceit under Antiguan law.   Any contrary holding "would permit defendants to escape liability for losses they have caused through their wrongdoing." (Houseman Decl. ¶ 20(f)(vi), Ex. Q at 39.)

In any event, "there is an abundance of evidence in the record" that FTX and Alameda commingled funds.  *Giles*, 2024 WL 4562675, at *6 (citing *Second Interim Report of John J. Ray III to the Independent Directors:   The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1]).   "In fact, the Debtors' commingling of funds was so prolific that even the team of experts hired post-petition to disentangle the mess had difficulty doing so." *Id.* (concluding that, in light of this commingling, both FTX and Alameda had an interest in the assets they sought to recover, regardless of the Debtor entity from which the assets originated). The fact that the FTX Insiders moved money out of one entity they controlled to cover losses at another entity they controlled does not mean that neither entity suffered losses.   Given this extensive commingling, there can be no doubt that both FTX and Alameda—and, more importantly, their creditors—suffered losses as a result of Defendant's fraudulent activity. Defendant's apparent argument that ***no one*** suffered losses as a result of his misconduct would lead to unjust and absurd results.

*Second*, Defendant's attempt to recast Alameda as an uninvolved bystander to the fraud similarly ignores the well-pled allegations in the Complaint and the well-established relationship between Alameda and FTX.   The FTX Insiders together controlled both FTX and Alameda, and so any fraud perpetrated on FTX was effectively also perpetrated on Alameda. Regardless, under Antiguan law, to show reliance for purposes of establishing a claim for deceit, "[t]he essential question is one of causation" and "it is not necessary, as a matter of law, to prove

that the representee believed that the representation was true." (Houseman Decl. ¶¶ 19(a)-(b), Ex. K (*Farol Holdings Limited* v. *Clydesdale Bank* [2024] EWHC 593 (Ch)) at 219, & Ex. L (*Zurich Insurance Co plc* v. *Hayward* [2017] AC 142) at 18.) To state a claim, the Complaint need only show that Alameda's actions were a result of Defendant's misrepresentations. In *Zurich Insurance Co plc* v. *Hayward* [2017] AC 142, the court held that an insurer stated a claim for deceit where it relied on misrepresentations to cover a loss even though it was, by that time, aware of the possible fraud. (Houseman Decl. ¶ 19(b), Ex. L.) The Complaint alleges that Alameda functioned as a backstop liquidity provider for the FTX exchange, and that in stepping in to provide liquidity, Alameda was forced to act in reliance on Defendant's fraudulent misrepresentations, including by assuming Defendant's artificially inflated positions, which Defendant knew would collapse as soon as his market manipulation stopped. (Compl. ¶¶ 38-41, 63.) This is enough to establish reliance under Antiguan law. (*See* Houseman Decl. ¶ 19(e), Ex. L at 37 ("[A] party who has practised deception with a view to a particular end, which has been attained by it, cannot be allowed to deny . . . that it actually played a causative part in inducement.").)

Moreover, the Plan provides for substantive consolidation of the Debtors' estates (Plan § 5.7), which, as this Court has already held, has "the effect of both cancelling intercompany claims and merging the liabilities of separate debtors." *Giles*, 2024 WL 4562675, at *6. Thus, the Court may "blur[]" the "separateness" of FTX and Alameda and treat them "as if they were merged into a single survivor left with all the cumulative assets and liabilities." *Id.* (citations omitted).

### B.     The Complaint States a Claim for Breach of Contract Under Antiguan Law.

To state a claim for breach of contract under Antiguan law, a plaintiff must allege the existence of a valid and binding contract between both parties, that defendant breached one

or more terms of the contract, and that the breach caused a loss to the claimant.  (Houseman Decl. ¶ 21.)  Defendant concedes the first two elements, and does not dispute that Plaintiff has adequately alleged that Defendant's series of massive market manipulation schemes perpetrated on the FTX exchange breached the Terms of Service.  Instead, Defendant once again attempts to wiggle his way out of liability by arguing that (1) as with Plaintiff's fraud claim, Plaintiff has not pled damages to FTX because Alameda purportedly covered FTX's losses, and (2) Alameda was not party to the Terms of Service and thus cannot state a claim for breach of those contracts. (Mot. at 16-17.)  Both arguments fail.

*First*, Plaintiff has sufficiently pled loss to FTX as a result of Defendant's breaches of the Terms of Service.  Under Antiguan law, the evaluation of losses is the same with respect to claims for deceit and for breach of contract.  (Houseman Decl. ¶ 22(c).)  Thus, in light of the collateral benefit analysis discussed *supra* at 18-19 in the context of deceit, the losses suffered by FTX as a result of Defendant's breach qualify as "losses" for purposes of Plaintiff's breach of contract claim regardless of whether they were "covered" by Alameda—the "cover" does not rectify the loss.  (Houseman Decl. ¶ 20.)  Moreover, as explained above, FTX's and Alameda's assets were functionally the same, and any argument that FTX did not suffer losses because Alameda covered them completely misses the reality of how the FTX Group operated. (*See supra* at 19.)

*Second*, Alameda can enforce the contracts in its own right because Alameda was a third party beneficiary of the Terms of Service.  Both the 2020 and 2022 Terms of Service state that FTX's "affiliates" each "shall be a third party beneficiary" of the Terms of Service.  (2020 Terms of Service § 36; 2022 Terms of Service § 38.9.)  Alameda was an affiliate of FTX under the broad definition used in the Terms of Service in that the two companies were closely related

and shared the same leadership.  Given Alameda's role as a backstop liquidity provider (which was expressly discussed in the 2022 Terms of Service (2022 Terms of Service § 16.4)),[12] it is clear that Alameda was intended to receive the benefits of the contract like FTX.  Antiguan law allows for third parties to recover for a breach of a contract where the contract expressly provides that the third party is intended to receive a benefit from the contract.  (Houseman Decl. ¶ 23.)

### C.    The Complaint States a Claim for Unjust Enrichment.

To state a claim for unjust enrichment, a plaintiff must allege that a defendant has been enriched at the expense of the plaintiff, the enrichment was unjust, and there are no defenses available to the defendant.  (Houseman Decl. ¶ 24.)  Defendant does not dispute any of these elements, but instead asks this Court to dismiss Plaintiff's alternative claim for unjust enrichment on the basis that "[t]he Federal Rules only 'permit such claims to be pleaded in the alternative where . . . the existence or applicability of a contract is in dispute.'"  (Mot. at 17 (quoting *Hickey* v. *Univ. of Pittsburgh*, 81 F.4th 301, 316 (3d Cir. 2023)).)

This is a misstatement of law and a mischaracterization of the Federal Rules.  The Federal Rules permit alternative pleading, as does the law of Antigua and Barbuda (Houseman Decl. ¶ 28).  *Hickey* is inapposite here.  There, the plaintiff brought claims under Pennsylvania law.  Here, Plaintiff brings its unjust enrichment claim under Antiguan law, pursuant to which "[a] claimant may pursue a claim in unjust enrichment in the alternative to a contractual (or, indeed, a tortious) claim" as long as the claim is not "at odds" with the terms of the contract, such that it would "disrupt the allocation of risk for which the contract provides."  (Houseman

---

[12]    Defendant argues that he did not have "any reason to expect Alameda to know about or be influenced by any of his alleged representations."  (Mot. at 15-16.)  But in agreeing to the Terms of Service, Defendant was expressly made aware of the "backstop liquidity provider program," which "may come into play" in circumstances where it is "difficult or impossible to liquidate a Position," such as the massive, grossly inflated positions Defendant left for FTX and Alameda to deal with.  (2022 Terms of Service § 16.4.)

Decl. ¶¶ 25, 28.)  There is no reason to believe, and Defendant does not point to one, that the unjust enrichment claim is "at odds" with either Terms of Service, as the recovery sought is not barred by the contracts.  In any event, under Antiguan law, a plaintiff need not expressly plead the lack of existence of a contract.  (Houseman Decl. ¶ 28.)  Plaintiff has thus properly stated a claim for unjust enrichment.  Moreover, to the extent that Defendant disputes the existence or applicability of the Terms of Service, as he clearly does with respect to Alameda (Mot. at 16-17), he cannot also contend that the Terms of Service prevent Plaintiff from recovering damages for unjust enrichment.

###        D.        Section 547 of The Bankruptcy Code Applies Extraterritorially.

Defendant does not contest, and therefore concedes, that the Complaint has sufficiently alleged all requisite elements of preferential transfers under section 547 of the Bankruptcy Code, property recovery under section 550 of the Bankruptcy Code, and disallowance pursuant to section 502(d) of the Bankruptcy Code.  The only argument Defendant puts forward with respect to these claims is that section 547 supposedly "cannot be exercised extraterritorially," and that the section 550 and 502(d) claims therefore also fail.  (Mot. at 18-21.) In so arguing, Defendant relies entirely on cases from outside this Circuit.  Yet both cases in this Circuit addressing the extraterritorial application of the avoidance statutes have rejected Defendant's argument.[13]  *See In re Maxus Energy Corp.*, 641 B.R. 467, 562 (Bankr. D. Del. 2022) ("The Trustee can seek recovery under § 548 extraterritorially to claw back" fraudulent transfers); *In re FAH Liquidating Corp.*, 572 B.R. 117, 125 (Bankr. D. Del. 2017) (same).  The law in this Circuit is clear: "Congress' intent was to extend the scope of section 548"—and by

---

[13]        Although cases in this Circuit have only analyzed this question in the context of section 548, courts often interpret the parallel provisions of sections 547 and 548 interchangeably.  *See e.g.*, *In re French*, 440 F.3d 145, 152 (4th Cir. 2006) (relying on Supreme Court case analyzing section 547 to interpret parallel provision in section 548).

extension, section 547—"to cover extraterritorial conduct." *In re FAH Liquidating Corp.*, 572 B.R. at 124 (citation omitted).

Defendant argues that section 547 does not apply extraterritorially because (1) "there is no clear, affirmative indication that Congress intended section 547 of the Bankruptcy Code to apply extraterritorially" and (2) "[n]othing in the Complaint indicates that the alleged relevant transfers were domestic." (Mot. at 19-20.)  But Defendant ignores the well-established application of the two-step framework he purports to apply.  Indeed, even where the text of a statute "does not contain any express language or indication that Congress intended the statute to apply extraterritorially," "courts may look to 'context,' including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that statute to apply extraterritorially." *In re Lyondell Chem. Co.*, 543 B.R. 127, 151 (Bankr. S.D.N.Y. 2016) (quoting *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)).

With respect to section 547, the "surrounding provisions of the Bankruptcy Code" clearly evidence that Congress "intended that statute to apply extraterritorially." *Id.*  Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 "wherever located and by whomever held" becomes property of the estate.  11 U.S.C. § 541(a)(3); *see In re FAH Liquidating Corp.*, 572 B.R. at 125-26.  Section 550, in turn, "authorizes a trustee to recover transferred property to the extent that the transfer is avoided" under sections 547 and 548, among others.  *In re FAH Liquidating Corp.*, 572 B.R. at 125-26 (quoting *Lyondell*, 543 B.R. at 154-55).  Thus, "[i]t would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the

United States." *Id.* (quoting *Lyondell*, 543 B.R. at 154-55).  By incorporating section 541's definition of "property" into sections 547 and 548, "Congress made manifest its intent" that those provisions "apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located."[14]  *Id.* at 125 n.6 (quoting *In re French*, 440 F.3d at 151-52).  Indeed, it is difficult to imagine a broader statutory definition of estate property than property "wherever located and by whomever held."  11 U.S.C. § 541(a).

The contrary holding that Defendant asks this Court to adopt would undermine the *in rem* jurisdiction of the Bankruptcy Court by removing from its jurisdiction "assets that Congress has declared become property of the estate when recovered under section 541(a)(3)," including preferential transfers.  *In re FAH Liquidating Corp.*, 572 B.R. at 126.  Defendant's position, if adopted, would also be obstructive and damaging to the Bankruptcy Code's avoidance provisions and claims and distribution processes in a way that Congress could not possibly have intended.  In connection with these Chapter 11 Cases, which were commenced in the United States, Defendant filed two proofs of claim asserting the right to recover tens of millions of dollars, thereby submitting himself to this Court's jurisdiction.  (Compl. ¶¶ 94, 105.)  Congress could not have intended to exclude preferential transfers to foreign persons from the reach of the avoidance statutes, but simultaneously intended to allow such persons to collect the value of those preferential transfers pursuant to the claim process to the obvious detriment of other creditors.  *See In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ("A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results.").

---

[14]     Section 541's broad definition of estate property is incorporated into both sections 547 and 548 through section 550, and the Supreme Court has held that section 547 "mirrors § 541's definition of 'property of the estate.'"  *Begier* v. *I.R.S.*, 496 U.S. 53, 58 n.3 (1990).  The argument in favor of extraterritoriality thus applies equally to both sections.

## IV.    THE COURT SHOULD DISALLOW DEFENDANT'S CLAIM.

Count Eight of the Complaint objects to Defendant's only remaining claim into the estate (Claim No. 81455) in accordance with Bankruptcy Rule 3007(b).  Count Eight is related to the other allegations in the Complaint, as the claim seeks to recover funds from an account used for Defendant's fraudulent exploits.  (Compl. ¶¶ 102-104.)  Under the carefully negotiated Case Management Order [Adv. D.I. 5], Defendant had well over 30 days to respond to the Complaint, including the objection to his claim.  Defendant's response to the Complaint ignores Count Eight entirely, and Defendant does not move to compel arbitration, dismiss, or otherwise respond to the objection.  Given that the time to respond to the objection has elapsed and Defendant has not responded, Plaintiff respectfully requests that the Court enter an order disallowing Defendant's claim.  *See In re Mallinckrodt PLC*, 639 B.R. 837, 861, 879 (Bankr. D. Del. 2022) ("[I]f a claim objection is filed and the claimant fails to respond, the claim is disallowed.").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

Dated:  April 11, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       cobb@lrclaw.com
       mcguire@lrclaw.com
       robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com

*Counsel for Plaintiff*